UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MATTHEW MATTEO,

                Plaintiff,

               -against-


COUNTY OF NASSAU, *et al.*,

                Defendants.
------------------------------------------------------------X

**REPORT AND RECOMMENDATION**

15-CV-06880 (JMA)(JMW)

**A P P E A R A N C E S:**

Frederick K. Brewington, Esq.
Albert Darnell Manuel, III, Esq.
Cobia Malik Powell, Esq.
Leah Elizabeth Jackson, Esq.
**The Law Offices of Frederick K. Brewington**
556 Peninsula Boulevard
Hempstead, NY 11550
*Attorneys for Plaintiff*

Anne Marie Esposito, Esq.
**Conway Farrell Curtin & Kelly, P.C.**
48 Wall Street, 20th Floor
New York, NY 10005
*Attorney for Defendants County of Nassau,*
*Nassau County Sheriff's Department, and*
*Nassau County Correctional Facility*

Laurel R. Kretzing, Esq.
**Jaspan Schlesinger LLP**
300 Garden City Plaza, Suite 5th Floor
Garden City, NY 11530
*Attorney for Defendants County of Nassau,*
*Nassau County Sheriff's Department, and*
*Nassau County Correctional Facility*

Alexander Sendrowitz, Esq.
**Quatela Chimeri, PLLC**
888 Veterans Memorial Highway, Suite 530
Hauppauge, NY 11788
*Attorney for Defendants County of Nassau,*
*Nassau County Sheriff's Department, and*
*Nassau County Correctional Facility*

Scott J. Kreppein, Esq.
**Devitt Spellman Barrett, LLP**
50 Route 111, Suite 314
Smithtown, NY 11787
*Attorney for Defendant Nassau County Sheriff's Department*
*and Nassau County Correctional Facility*

**Jay Ward**
*Appearing Pro Se*

**Correction Officers "John Doe 1-10"**
*No Appearance*

Cathleen Kelly Rebar, Esq.
Jayne L. Pickup, Esq.
**Rebar Kelly**
470 Norristown Road, Suite 201
Blue Bell, PA 19422
*Attorney for Defendants Armor Correctional Health Services, Inc.*
*and Dr. Sanchez*

Dale Nicholson McLaren, Esq.
John J. Doody, Esq.
**Lewis, Brisbois, Bisgaard & Smith LLP**
77 Water Street, 21st Floor
New York, NY 10005
*Attorney for Defendant Dr. Sanchez*

**WICKS,** Magistrate Judge:

Plaintiff Matthew Matteo commenced this action pursuant to 42 U.S.C. § 1983, the First

and Fourteenth Amendments, 42 U.S.C. §§ 12131-12143 (Title II of the Americans with

Disabilities Act ("ADA")), Section 504 of the Rehabilitation Act, and various state laws,

alleging, *inter alia*, negligent supervision, excessive force, deliberate indifference, and retaliation

claims.  (DE 1.)  Plaintiff alleges that during his incarceration, Defendants denied him adequate

medical treatment on several occasions.  (DE 1.)

Before the Court is (1) Defendant Armor Correctional Health Services, Inc.'s ("Armor")

and (2) the County of Nassau, Nassau County Correctional Facility ("NCC") and Nassau County

Sheriff's Department's (collectively "County Defendants") motions for summary judgment (DE

89 and 98).  Plaintiff filed opposition to both motions.  (DE 89-27; DE 98-37.)  For the reasons

that follow, the undersigned respectfully recommends that Defendants' motions for summary

judgment (DE 89, DE 98) be granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Relevant Factual Background[1]

### The Injury and Corresponding Medical Treatment

On February 5, 2013, Plaintiff Matthew Matteo was admitted to the NCC.  (DE 98-20 at

¶ 1.)  On October 29, 2013, Plaintiff was involved in an altercation with two other inmates, and

---

[1] The facts set forth above are taken from the parties' respective Rule 56.1 Statements (*see* DE 89-1; DE 98-1 (Defendants'); DE 89-12; DE 98-20 (Plaintiff's)).  Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement throughout this Report and Recommendation means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it. Where relevant, however, the Court may also cite directly to an underlying document.  The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal.  *See Stewart v. Fashion Inst. of Tech.*, No. 18-CV-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C. Hous. Auth.*, No. 03-CV-2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). "Additionally, to the extent [a party's] 56.1 statement 'improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts,' the Court has disregarded [such] statement[s.]"  *McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020).

received a disciplinary write-up. (*Id.* at ¶ 5.) During this scuffle, Correction Officer Jay Ward allegedly struck Plaintiff on the left jaw; thereafter, Plaintiff was evaluated by Armor physician Dr. Laura Hunt.[2] (DE 98-1 at ¶¶ 23, 16.) Dr. Hunt asked Plaintiff to perform several jaw maneuvers, and testified that she did not observe any oral bleeding or dislodged teeth. (DE 89-1 at ¶ 60.) Dr. Hunt then provided Plaintiff with Motrin 600 mg and scheduled an x-ray for the following morning; this x-ray revealed that Plaintiff's left mandibular body had been fractured. (*Id.* at ¶ 62.) Dr. Hunt placed Plaintiff on an all-liquid diet, which consisted primarily of Boost and Ensure nutritional supplements, and advised him to take a muscle relaxer in the evenings to ease discomfort. (*Id.* at ¶¶ 45, 64.)

Plaintiff's fractured jaw required surgery—Dr. Hunt testified that the Oral Maxillofacial Surgery Department at Nassau University Medical Center ("NUMC") sent Armor a list of potential surgery dates. (*Id.* at ¶ 65.) In the meantime, NCC primary care physician, Dr. Sanchez, ordered a fifteen-day supply of Motrin 800 mg for Plaintiff. (*Id.* at ¶ 75.) Plaintiff consulted with an oral maxillofacial surgeon at NUMC on November 8, 2013; he was found fit for confinement and the surgery was scheduled to take place four days later. (*Id.* at ¶ 16.) Dr. Sanchez then executed a special needs relocation form, and directed that Plaintiff be moved into the facility's infirmary. (*Id.* at ¶ 71.)

On November 12, 2013, NUMC surgeons inserted a plate and wires into Plaintiff's jaw, and Dr. Sanchez prescribed him antibiotics and Percocet. (DE 98-20 at ¶ 15; DE 89-1 at ¶ 76.) Plaintiff had a follow-up appointment at NUMC on November 27, 2013; that day, physicians tightened the wires, and observed that the fracture appeared to be improving. (DE 89-1 at ¶ 17.) Armor Progress Notes for November 29, 2013 recount that Plaintiff experienced no acute

---

[2] Plaintiff also alleges that on January 27, 2014, he was again assaulted by Officer Jay Ward with other officers. (DE 98-1 at ¶ 24.)

distress; however, on December 1, 2013, Plaintiff sneezed and dislodged several wires.  (*Id*. at ¶¶ 19-20.)  These wires were replaced on December 4, 2013.  (*Id.* at ¶ 23.)  One week later, the wires became dislodged again after Plaintiff consumed chips and chocolate.  (*Id*. at ¶ 25.)  On December 13, 2013, the wires were removed, and Plaintiff was instructed to adhere to the no-chew/full liquid diet.  (*Id*. at ¶ 27.)  Soon after, Dr. Martin-Naar determined that Plaintiff no longer required Percocet to manage his pain, and thus denied Plaintiff's refill request.  (DE 98-30 at ¶ 19.)

Following his release from NCC, Plaintiff did not receive jaw care at another medical facility.  (DE 89-1 at ¶ 52.)  On April 4, 2019, Plaintiff was examined by otolaryngologist  Dr. Josh Werber, who concluded that Plaintiff's ongoing symptoms of "jaw pain, jaw clicking, and nasal obstruction" are sequelae of the mandibular fracture .  (*Id*. at ¶¶ 102-104.)  However, oral maxillofacial surgeon Dr. Mordechai Hoschander found no evidence that Plaintiff's nasal fracture was caused by his 2013 injury.  (DE 89-1 at ¶ 124.)  Defendants continue to deny any causal relationship between the jaw fracture and Plaintiff's persisting symptoms.  (DE 90-38 at ¶ 33.)

**Plaintiff's Bipolar Disorder Diagnosis and Corresponding Mental Health Treatment**

Upon admission to NCC, inmates answer questions about their physical and mental health, and corrections officers are notified if an inmate has previously attempted suicide.  (DE 98-20 at ¶ 40; DE 89-1 at ¶¶ 30-31.)  From the period of 2011 to 2016, Dr. Vincent Manetti acted as NCC's sole psychiatrist; his responsibilities included evaluating inmates, adjusting their psychiatric medication doses, and mediating inmate conflicts when possible.  (DE 89-1 at ¶¶ 78-83.)

Plaintiff claims that he took psychiatric medication prior to his arrival at NCC, though he does not recall the name of the drug.  (*Id*. at ¶ 35.)  During his stay at NCC, Plaintiff was sent to Mid-Hudson Forensic Psychiatric Center once, and was given psychiatric medication daily, but again cannot recall whether this medication was an appropriate substitute for his prescribed Seroquel.  (DE 89-1 at ¶¶ 36, 38.)

On February 5, 2013, Plaintiff underwent a mental health screening—he reported a history of bipolar disorder and hallucinations, and later asserted that he had chronic memory problems and an unspecified learning disability.  (*Id*. at ¶¶ 10, 33.)  Dr. Manetti examined Plaintiff once again on May 12, 2013, and noted that Plaintiff's mood was controlled and that his hallucinations had subsided somewhat, though his emotional response was slightly narrow.  (*Id*. at ¶ 86.)  Dr. Manetti asked Plaintiff to continue taking Olanzapine twice daily to further reduce the auditory hallucinations.  (*Id*. at ¶ 87.)  On May 20, 2013, Dr. Manetti met with Plaintiff again and noted that Plaintiff had no desire to self-harm and that his impulse control and behavior appeared normal.  (*Id*. at ¶ 88.)

Several months later, Plaintiff requested that his Olanzapine prescription be reduced, and Dr. Manetti complied with this request.  (*Id*. at ¶ 89.)  On September 15, 2013, Dr. Manetti noted that Plaintiff appeared stable despite suffering from a mood disorder; two months later, Dr. Manetti halted Plaintiff's Olanzapine prescription and instead prescribed him an anti-depressant, Trazadone.  (*Id*. at ¶ 93.)  However, NCC Chaplain John McGonigle allegedly witnessed Plaintiff sitting naked on his bunk and staring despondently at the cell floor, and Plaintiff asserts that Defendants failed to adequately address his deteriorating mental health.  (DE 98-20 at ¶ 45.)

**NCC's Response to Plaintiff's Grievances and Sick Requests**

On or about October 30, 2013, Plaintiff submitted a grievance to NCC, which noted that Plaintiff was assaulted on October 29, 2013 and had a broken jaw.  (DE 98-1 at ¶ 13.)  This grievance did not specify that a member of the corrections staff assaulted Plaintiff.  (DE 98-15 at 29 (October 29 Grievance).)  The grievance noted that Plaintiff had not received adequate medical care and that there was no officer sitting inside the dorm when the attack occurred.  (*Id.*)  Regardless, this grievance was in accordance with NCC's Inmate Grievance Policy as outlined in the Inmate Handbook.  (DE 98-1 at ¶¶ 8-10.)  The grievances are collected by the officer assigned to the Grievance Unit—Plaintiff testified that he was familiar with this protocol.  (*Id.*)

Officer Hutter responded to Plaintiff's grievance by photographing the logbook and attempting to prove that officers were present at the scene of the altercation—though he admits that he did not speak with these officers.  (DE 98-38 at ¶ 8.)  And, though inmates may appeal denied grievances, Plaintiff "does not remember" whether he submitted an appeal following his October grievance's eventual denial.  (DE 89-1 at ¶ 48.)  As such, the County Defendants maintain that Plaintiff failed to exhaust all available administrative remedies.  (DE 98-1 at ¶ 29.)

From October 2013 to November 2013, Plaintiff submitted numerous sick requests, in which he described his pain and alleged undernourishment.  (DE 98-30 at ¶ 12.)  Plaintiff alleges that he made these requests daily for two weeks; however, Defendants respond that Plaintiff submitted only nine sick requests, and assert that Plaintiff's injuries were addressed swiftly and effectively.  (*Id.* at ¶ 17.)  Plaintiff submitted more sick requests in the months following his surgery, once again bemoaning his pain and malnutrition.  (DE 98-20 at ¶ 17.)  Plaintiff also filed a grievance pertaining to the liquid diet, and alleges that Defendant officers forcibly withheld his

meals in retaliation, though Defendants contend that this is an unsubstantiated assertion.  (DE 98-38 at ¶ 22.)

### B.  The Complaint and Ensuing Procedural History

Plaintiff filed his Complaint against all Defendants on December 3, 2015.  (DE 1.)  He asserts, *inter alia*, claims of negligent supervision, discrimination, abuse of the disabled, and negligence.  (*Id*. at ¶ 1.)  The County Defendants denied all allegations in their Answer, filed on February 18, 2016; Defendant Armor filed its Answer on March 25, 2013 and similarly denied all allegations.  (DE 8; DE 13.)  The parties agreed to a proposed Scheduling Order on June 20, 2016.  (*See* Electronic Order dated June 20, 2016.)

Following this, the parties commenced fact discovery in accordance with the Scheduling Order.  (DE 16-20.)  Though the deadline was extended several times, Plaintiff and Defendants officially completed fact discovery on September 19, 2018.  (*See* Electronic Order dated September 19, 2018.)  The parties discussed settlement on November 1, 2019, but were unable to reach an agreement.  (DE 51.)  Thereafter, the parties participated in expert discovery, which finally concluded on April 28, 2022.  (DE 71.)

Before the Court are Defendant Armor's and County Defendants' motions for summary judgment, which were filed on November 29, 2022 and December 12, 2022, respectively.  (DE 89; DE 98.)  Plaintiff's opposition (DE 89-27; DE 98-37) and Defendants' respective replies were also bundle filed on each of those dates (DE 89-28; DE 98-39).  On May 8, 2023, the instant motion was referred to the undersigned by the Hon. Joan M. Azrack for a report and recommendation.  (Electronic Order dated May 8, 2023.)

## II.    LEGAL STANDARD

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  Once the movant meets its initial burden, the nonmovant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002).

The Court is to draw all reasonable inferences in favor of the non-movant, *Anderson*, 477 U.S. at 255, but the nonmovant must still do more than merely assert conclusions that are unsupported by arguments or fact. *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).  The role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely *identify* whether genuine issues of material fact exist for trial. That is, the court's function is "issue finding," not "issue resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp. 3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d Cir. 1994)).  It is through this lens that the undersigned examines both Defendants' motions for summary judgment.

### III.    DISCUSSION

Defendants advance a host of arguments in favor of summary judgment as follows. Defendants first argue Plaintiff failed to exhaust his administrative remedies. Plaintiff cannot establish section 1983 claims against Defendants because of a failure to identify a policy or practice depriving him of his constitutional rights. Plaintiff's section 1983 claim against the individual defendants is time-barred. Plaintiff set forth no specific allegations pertaining to his constitutionally protected conduct or showing discriminatory animus, which is fatal to his constitutional and ADA and Section 504 claims. (DE 98-19 at 11, 15.) And finally, without any federal causes of action in sight, the exercise of supplemental jurisdiction over Plaintiff's state law claims would be inappropriate. Plaintiff naturally disagrees on all fronts.

Each of the parties' arguments is explored below.

### A.    Exhaustion of Administrative Remedies as to All Claims

Defendants each move for summary judgment on the ground that the Prison Litigation Reform Act of 1995 ("PLRA") bars Plaintiff's section 1983 claims given Plaintiff's failure to exhaust his remedies. (DE 89-11 at 13; DE 98-19 at 7.) Namely, Plaintiff's failure to appeal the denial of his grievance. Additionally, Armor Defendants note that Plaintiff has not alleged nor established that his failure to exhaust his administrative remedies should be excused. Plaintiff avers that he submitted grievances, that his failure to exhaust is not a foregone conclusion, and that he never affirmatively stated that he failed to adhere to the grievance process.

### i.    Standard for Exhaustion

Pursuant to the PLRA, prisoners cannot bring an action under section 1983 or *any* federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added). "The PLRA exhaustion requirement 'applies to all inmate suits about prison

life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." *Angulo v. Nassau County*, 89 F. Supp. 3d 541, 549 (E.D.N.Y. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009)). It is undisputed that Plaintiff is a former "prisoner" within the meaning of the PLRA. *See* 42 U.S.C.S. § 1997e(h). This means that *all* of Plaintiff's federal claims must comply with the PLRA's exhaustion requirement.

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Angulo*, 89 F. Supp. 3d at 549 (quoting *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006)). Thus, courts "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Id*. (quoting *Espinal*, 558 F.2d at 124.) A defendant "bears the burden of establishing a plaintiff's failure to exhaust administrative remedies since it is considered an affirmative defense." *Hubbs v. Suffolk County Sheriff's* Dept, 788 F.3d 54, 59 (2d. Cir. 2015). A defendant may establish that "a grievance process exists and applies to the underlying dispute" by "pointing to legally sufficient source[s] such as statutes, regulations, or grievance procedures." *Id*. (internal quotation marks omitted).

Even if disputed issues of fact exist, the threshold question of exhaustion under the PLRA is a matter for the court to decide. *See Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011) ("[T]he presence of disputed material facts [does not] convert[] exhaustion into a jury issue."); *Abdur-Rahman v. Terrell*, No. 10-CV-3092 (DLI) (LB), 2012 WL 4472119, at *5 (E.D.N.Y. Sept. 25, 2012) ("[D]etermining whether an inmate has exhausted his remedies is a threshold matter for

the court to decide, even where there is a disputed issue of fact." (citing *Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011)); *Aguiar v. Murray*, No. 11-CV-3944 (DLI) (LB), 2014 WL 1330739, at *4 (E.D.N.Y. Apr. 1, 2014) (same); *Abernathy v. Strada*, No. 12-CV-6072 (DLI) (VVP), 2015 WL 997980, at *3 (E.D.N.Y. Mar. 6, 2015) (same).

### ii. Plaintiff's Failure to Appeal

Defendants argue that Plaintiff failed to exhaust his administrative remedies as to the following: (1) Plaintiff's objections to medical treatment he received (DE 89-11 at 14-15); (2) the October 29, 2023 incident (DE 98-19 at 9), and (3) the January 2014 incident (*id.*).

As a threshold matter, Defendants have met their burden in in establishing that a grievance procedure exists. Namely, NCC states that the handbook is issued to all persons upon their admission into the facility. (DE 98-19 at 8.) The Inmate Handbook outlines the general grievance procedure and explains the appeals process. (DE 98-13 at 4-5.) The Handbook notes the following grievance procedure:

> The Grievance Procedure dictates that an inmate must fill out a grievance form within five (5) days of the act or occurrence leading to the grievance and within five (5) business days of receipt of a grievance, the Grievance Coordinator will issue a written finding. If the inmate does not agree with the decision, the Inmate Handbook details the process for the inmate to appeal, first to the Chief Administrative Officer, then to the New York State Commission of Correction's Citizens Policy and Complaint Review Council.

*Trotman v. Sposato*, No. 18-CV-2711 (GRB)(LB), 2021 U.S. Dist. LEXIS 259052, at *15 (E.D.N.Y. Aug. 24, 2021) (citations omitted) (describing the same NCC Inmate Handbook's Grievance Procedure at issue here); *see also Robinson v. Cty. of Nassau,* No. 12-CV-1450 (SJF) (SIL), 2017 U.S. Dist. LEXIS 211266, at *3-4 (E.D.N.Y. Dec. 20, 2017) (noting the grievance filing and appeals process at NCC).

Plaintiff was aware of all internal requirements associated with NCC's grievance procedure. He concedes that he received and familiarized himself with the Inmate Handbook— and the grievance procedure therein—during his incarceration. (DE 89-27 at 4; *see also* Matteo

Deposition Transcript, DE 98-7 at 14 (Matteo: "I know I filed grievances before…."); *id.* at 52

("I know I put a couple of grievances in.")) In fact, Plaintiff filed various grievance forms in the

past, some of which related to his liquid diet and the pain he experienced as a result of his

alleged broken jaw. (DE 98-15; DE 89-27 at 5.) However, when Plaintiff was asked whether he

appealed a denied grievance, he responded "I don't remember." (DE 89-7 at 102.) And there is

no corresponding evidence reflecting an appeal.

The grievance filed regarding the October 29, 2023 incident has a handwritten notation

that Plaintiff "refused" to sign the grievance form at the section that notes whether Plaintiff

would like to accept the decision or appeal it. (*See* DE 98-15 at 29.) Thus, Plaintiff was the

victim of his own demise here—had he signed the form to appeal his grievance, he would have

properly exhausted his claims and complied with NCC procedure.

Moreover, Plaintiff does not argue that his failure to exhaust is excused under any

cognizable exception. An administrative remedy is considered unavailable when (1) it functions

as a "dead end" because officers are unable or consistently refuse to provide relief to inmates, (2)

it is so opaque as to be unusable because despite its existence "no ordinary prisoner can discern

or navigate it," or (3) "when prison administrators thwart inmates" from utilizing remedies

through "machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 633

(2016)). There is no evidence that an appeal would have been a dead end, or that anyone

prevented Plaintiff from filing an appeal. *Hubbs v. Suffolk County Sheriff's Dep't*, 788 F.3d 54,

59 (2d. Cir. 2015) (noting that administrative remedies can be considered "unavailable" if the

plaintiff can show that he received threats from correction officers preventing him from

appealing his grievance).

In his opposition, Plaintiff contends that at no point did he state in his Complaint that he failed to follow all required procedures, and further argues that he is not required to plead complete exhaustion or demonstrate such in the Complaint. (DE 89-27.) This argument is misplaced for two reasons. *First*, this misstates the law to be applied here, that is, under the PLRA, there *is* an exhaustion requirement, which explicitly applies to section 1983 claims and all other federal claims. *See* 42 U.S.C. § 1997e(a). Exhaustion is an affirmative defense that can be raised by Defendant. *See Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) ("Failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement."). So, even if Plaintiff did not *plead* exhaustion, it is irrelevant. *Second*, at the summary judgment stage, once Defendants point to evidence of a failure to exhaust administrative remedies, as they have here, Plaintiff bears the burden to come forward with evidence to overcome or dispute the defense. Otherwise, Plaintiff's claims fail to withstand summary judgment.

In short, the PLRA is clear that exhaustion is mandated. Plaintiff cannot now claim ignorance and commence an action in federal court having failed to properly appeal his claims internally.[3] The undersigned respectfully finds that Plaintiff has not come forward with any evidence showing that he exhausted his administrative remedies prior to filing this action. *See Kasiem v. Switz*, 756 F. Supp. 2d 570, 576 (S.D.N.Y. 2010) (granting summary judgment for failure to exhaust where plaintiff's claims were never exhausted or became fully exhausted months after Plaintiff filed suit); *Morrison v. Stefaniak*, 523 Fed. Appx. 51, 52 (2d Cir. 2013)

---

[3] Indeed, there appear to be two grievances that were accepted yet subsequently appealed by Plaintiff. In other words, Defendants took action to quell Plaintiff's concerns and address his requests, but Plaintiff appears to have checked off the box stating that he "read and appeal[ed] the Grievance Coordinator's decision." (*See* DE 98-15.) There is no evidence that an appeal was undertaken, and Plaintiff has not pointed to these appeals as evidence of exhaustion of remedies via NCC's grievance procedure.

(upholding dismissal because plaintiff failed to appeal the Inmate Grievance Resolution Committee's decision).  For these reasons, the motion for summary judgment should be granted on failure to exhaust grounds.

In the event the Judge Azrack disagrees with the undersigned's conclusion that Plaintiff failed to exhaust his administrative remedies with respect to his federal claims, the undersigned also examines the merits of each of Defendants' federal claims, beginning with Plaintiff's section 1983 claims.

### B.  Plaintiff's Failure to State a Claim Under Section 1983 Against Defendants

Here, the federal vessel for Plaintiff's claims is Section 1983, which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42  U.S.C. § 1983.

"[S]ection 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred[.]"  *Schuloff v. Queens Coll. Found., Inc.*, 165 F.3d 183, 184 (2d Cir. 1999) (internal quotation marks omitted).  A plaintiff asserting a section 1983 claim must establish that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States."  *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

Defendants make a variety of arguments as to why Plaintiff's section 1983 claims fail.  Each are addressed below.

### i. Plaintiff's Section 1983 Deliberate Indifference Claim under the Fourteenth Amendment

Plaintiff alleges that Defendants violated his constitutional rights under the Fourteenth Amendment in failing to treat his alleged broken jaw and his mental health. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (noting that deliberate indifference claims are analyzed under the Fourteenth Amendment). Such analyses "require[] a showing of deliberate indifferences to a detainee's medical needs." *Jones v. Sheriff of Suffolk Cty.*, 518 F. Supp. 3d 650, 657 (E.D.N.Y. 2021); *see also Pooler v. Nassau Univ. Med. Ctr.*, 848 F. Supp. 2d 332, 344 ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the Eighth or Fourteenth Amendment.").[4]

Plaintiff asserts deliberate indifference on part of Defendants as to his medical care, while Defendants assert that Plaintiff fails to state such a claim. Deliberate indifference of a prisoner's "serious medical needs" amounts to cruel and unusual punishment in violation of the Eighth Amendment, which is applicable to the states through the Fourteenth Amendment's Due Process Clause. *Id.* Courts assess plaintiffs' section 1983 claims deliberate indifference claims under an objective and a subjective component. *Jones,* 518 F. Supp. 3d at 657. Each of these prongs are explored below.

### a. Objective Test: Sufficiently Serious

Plaintiff must first demonstrate the objective component—that he had a "sufficiently serious need" of medical treatment. *Id.* The inquiry focuses on whether the inadequacy of medical treatment was "sufficiently serious." *Id.* Determination of

---

[4] The undersigned notes that Plaintiff fails to cite the applicable law for a deliberate indifference claim. Plaintiff instead cites law required to hold a municipality accountable which is separate and apart from what is necessary to show that Defendants acted with "deliberate indifference." (*See* DE 89-27 at 7-8.)

whether treatment is seriously needed tends to concentrate on plaintiff's "physical ailments, not simply how he reported them…but whether according to the medical records and the other facts of record, a reasonable jury could conclude that plaintiff faced death, degeneration of his conditions, or extreme physical pain." *Id.* (quoting *Hathway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (holding the defendant's "failure to treat [plaintiff's] syphilis was the result of deliberate indifference to a serious medical need"); *see also Brock v. Wright*, 315 F.3d 158, 162-64 (2d Cir. 2003) (holding "self-reports of chronic pain" were to be considered with medical records in the objective, sufficiently serious assessment).

The Second Circuit recently rendered a decision vacating and remanding a District Court's decision dismissing a complaint for failure to state a deliberate indifference claim. *Collymore v. Krystal Meyers, RN*, No. 21-2292, 2023 WL 4535752, at *1 (2d Cir. July 14, 2023). The *Collymore* case is instructive here. In *Collymore,* the trial court dismissed Plaintiff's section 1983 complaints which alleged deliberate indifference based on his scalp condition; the court stated that plaintiff failed to plead a "sufficiently serious medical condition." *Id.* However, the Second Circuit found otherwise—it turned to defendants' inadequate treatment for infections and lesions on his scalp, which "bled and oozed pus," constituting a violation of the Eighth Amendment's cruel and unusual punishment clause. *Id.* Plaintiff's condition soon worsened and became "intolerable." *Id.* What's worse is that defendants "fail[ed] to resolve his case or [even] listen to his appeals." *Id.* The Second Circuit ultimately found that "conditions such as inflammation can be minor and treatable, or they can be agonizing and resistant." *Id.* In *Collymore,* it was the latter because his condition "produce[d] severe and

unmanage[able] pain" and the Second Circuit found that he did not need to allege with specificity the site and cause of pain if it was intense and inflicted unnecessarily and wantonly.  *Id.*  at *6.  Thus, conditions that cause pain that are annoying and extreme can be serious medical conditions and need not be life-threatening or unbearable.  *Id.* at *7.

After an extensive review of the record, the undersigned notes several significant differences between *Collymore* – which was decided under Rule 12(b)(6) -- and the circumstances presented here in the context of summary judgment.  *First,* Defendant Armor has demonstrated that it gave Plaintiff his medication and responded to him each time he sought medical attention.  There is ample evidence showing that on the day of the incident, Armor provided him with Motrin and other medications for his jaw (DE 98-7 at 87), scheduled him for an x-ray within two days after the incident (*id.* at 96-97), and subsequently followed up with surgery the next month.  (*See* DE 89-11.)  And, regarding his mental health, Defendant Armor alleges that Plaintiff was sent to the Mid-Hudson facility to get checked for his mental health back in 2013.  (DE 87-7 at 85-86.)

*Second*, unlike the Plaintiff in *Collymore*,  here there is no evidence that any Defendant prevented Plaintiff from filing a grievance or further appealing his determinations.  *Third,* the serious conditions of bleeding and unmanageable pain are not present here.  There is no indication that Plaintiff's condition here worsened or that he has any scarring from the incident.  In fact, Defendant Armor states that Plaintiff himself disobeyed medical orders that were intended to help him by eating chocolate and chips when he was on a strict liquid diet.  (DE 89-1 at ¶ 25.)  Plaintiff's condition therefore falls within the Second Circuit's category of "minor and treatable" since he was provided the requisite treatment and failed to follow instructions from medical personnel.

18

Of course, fundamentally, this case is beyond the mere "pleading" stage. Here, discovery is complete, evidence proffered, and the burden on a motion for summary judgment is for Plaintiff to come forward with admissible evidence demonstrating a genuine issue of material fact exists for trial. This analysis negates any possible finding that Plaintiff had a sufficiently serious need for medical treatment.

The second prong of the deliberate indifference test is considered below, that is, whether Defendants acted with the requisite intent and conduct resulting in a violation of Plaintiff's constitutional rights.

### b.  Subjective Test: Culpable State of Mind

The subjective component of the deliberate indifference test looks to the "intent and conduct of the physician charged with plaintiff's care." *Jones*, 518 F. Supp. 3d at 657.  "Deliberate indifference" is extant when one acts intentionally "to impose the alleged condition, or recklessly fail[s] to act with reasonable care to mitigate the risk that the condition posed to the [plaintiff] even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 657-58 (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *see also Pooler*, 848 F. Supp. 2d at 344 (noting that the second prong of the deliberate indifference test asks whether the official acted with culpable intent and disregarded the known substantial risk of serious harm and failed to reasonably rectify it).

"Prison officials and medical officers have wide discretion in treating prisoners, and 'determinations of medical providers concerning the care and safety of patients are given a presumption of correctness.'" *Sonds v. St. Barnabas Hos. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) (quoting *Perez v. Cty. of Westchester,* 83 F.

Supp. 2d 435, 440 (S.D.N.Y. 2000)).  Thus, if a patient disagrees over the various medications or types of treatment he is receiving, he cannot seek refuge in a section 1983 claim.  *Jones*, 518 F. Supp. 3d at 657.

The unrebutted record supports the conclusion that Armor diligently adjusted Plaintiff's dosages at his own request.  (DE 98-35 at 78.)  And there are several instances where Plaintiff himself testified that both Defendants acted swiftly to provide adequate medical treatment.  *See* Matteo Deposition Transcript DE 98-7 at 23 (discussing that he lost consciousness, and he was taken to medical); *id*. at 30 (explaining that he was taken to an outside hospital and put on medication); *id*. at 38 (stating that a nurse would come to his cell for assessments); *id*. at 41 (explaining that he was in his own room with a hospital bed for four months); *id*. at 110 (explaining that he had follow up treatments "[l]ike twice a month").

There is also ample evidence in other deposition transcripts – not countered by Plaintiff -- that prison personnel did not act with the required culpable state of mind, namely the intent to act and disregard the risk of substantial harm.  (*See* Martin-Naar Deposition Transcript, DE 98-26 at 78) (noting that the facility monitored patients on hunger strikes and would bring them into the infirmary to do so); (*id*. at 87) (noting the diet Dr. Martin-Naar put Plaintiff on—one can of Ensure three times a day); (*id*. at 91) (noting that it was *Plaintiff* that refused ice for his jaw, and that Motrin and x-rays were ordered for his jaw); (*id*. at 98) (explaining that "standard medical practice was to treat any pain and to ensure [inmates are] able to eat…."); (*id*. at 99) (noting that a broken jaw is *not* considered an urgent situation); (*id.* at 191) (noting that he was given Motrin and Percocets); (*see also* Manetti Deposition Transcript, DE 98-35 at 29) (noting that Plaintiff

was receiving Haldol); (*id*. at 95, 97) (noting that Plaintiff was given Trazodone and taken off Olanzapine because of his restlessness symptoms); (*id*. at 113) (noting that Plaintiff was seen bi-weekly for his mental health).

Though Plaintiff states he was given inadequate medical treatment, the Sick Call Requests (DE 98-25) indicate that Defendants responded to them within three (3) days, sometimes even the same day. (*See* DE 98-26 at 128) (noting that the facility answered his sick call request on November 14 and it was addressed that same day); (Hunt Deposition Transcript, DE 98-27 at 98-101) (discussing Plaintiff's sick requests were addressed within days). Even so, it was normal for an inmate to have to wait four days or more for a sick call to be responded to. (*See* Sanchez Deposition Transcript, DE 98-37 at 45). Further, there are only nine (9) sick call requests in the entire document, but Plaintiff claims to have put in sick call requests every day "for about two weeks" and no one visited him regarding these requests. (DE 98-7 at 26.) Plaintiff's naked assertions appear to contradict documentary evidence.

A careful review of the submitted grievance forms pursuant to NCC's policy (DE 98-15) support his conclusion as well:

- <u>Date</u>: February 25, 2013; <u>Grievance Number</u>: 127-02-13

  - <u>Request</u>: To see a doctor, not a nurse; requests x-ray results, pain treatment and if jaw is broken, then to be reset before it was "too late"

  - <u>Investigation</u>: Completed on February 27, 2013, finding that he was seen by a nurse practitioner the following day and x-ray results were normal.

  - <u>Outcome</u>: Grievance accepted on February 27, 2023.

- <u>Date</u>: March 13, 2013; <u>Grievance Number</u>: 074-03-13

- o <u>Request</u>: Plaintiff states he has been prescribed Seroquel on the street for three years and diagnosed with Bipolar Disorder, etc.  He requests proper treatment including being prescribed Seroquel.

- o <u>Investigation</u>: Completed on March 15, 2013, in which the Grievance Coordinator decided that Seroquel was not clinically needed.

- o <u>Outcome</u>: Grievance denied on March 19, 2013.  Plaintiff appealed on March 19, 2013.

  - ▪ On March 21, 2013, the grievance was then denied by the Chief Administrator Officer.  Captain Ford noted that no medication can be dispensed unless authorized or prescribed by the facility physician.

  - ▪ On March 29, 2013, Plaintiff took the next step in the process, this time appealing to the Citizen's Policy and Complaint Review Council at the Commission of Correction.

  - ▪ Plaintiff received a letter from the New York State Commission of Correction on May 21, 2013, also stating denial of his grievance.

- • <u>Date</u>: October 31, 2013; <u>Grievance Number</u>: 001-11-13:

  - o <u>Request</u>: Plaintiff says he was assaulted by an unknown person on October 29, 2023 and left with a broken jaw. No officer was sitting inside the dorm and he was in extreme pain and not given adequate medical attention. He requested to see a medical expert right away.

  - o <u>Investigation</u>: Completed on November 4, 2013, and the grievance was forwarded to the Internal Affairs Unit.

    - ▪ On November 6, an x-ray was conducted the following day of the incident and the results were "negative for fractures." The complaint was sent to the Internal Affairs Unit for review and action. The grievant was then advised to submit a sick call request if the condition worsened.

  - o <u>Outcome</u>: Grievance was accepted on November 6, 2013, but Plaintiff refused to sign the grievance form. He was explained the grievance process.

- • <u>Date</u>: November 4, 2013; <u>Grievance Number</u>: 020-11-13

- o  Request: Plaintiff claimed he was on a liquid diet and felt weak. He requested to receive protein shakes to maintain his weight and energy levels.

- o  Investigation: Completed on November 7, 2013, and the kitchen was ordered to provide a liquid diet that was nutritious and adequate for an adult.  If Plaintiff felt sick, he was advised to submit a sick call request.

- o  Outcome: Grievance was accepted on November 14, 2013, but Plaintiff refused to sign because medical took "too long to respond to his needs."

- Date: November 12, 2013; Grievance Number: 063-11-13

  - o  Request: Plaintiff wants pain medication for the pain from his mandibular surgery.

  - o  Investigation: Completed on November 15, 2013 and Plaintiff was seen the day after the grievance was filed and given Percocet for pain to take every six hours as needed for five days.

  - o  Outcome: Grievance accepted on November 21, 2013 and Plaintiff checked off that he "read and appeal[ed] the Grievance Coordinator's decision" the following day.  However, there is no evidence that an appeal was actually undertaken.

- Date: January 26, 2014; Grievance Number: 138-01-14

  - o  Request: Plaintiff to have lost his water privileges because of his placement next to a person without such privileges.  He requests to be given the proper treatment.

  - o  Investigation: Completed on January 28, 2014 after speaking with Captain Rhodes assured that the water was back on.

  - o  Outcome: On January 29, 2014, the grievance was accepted.  Plaintiff check off that he "read and appeal[ed] the Grievance Coordinator's decision."  However, there is no evidence that an appeal was actually undertaken.

(DE 98-15.)  Similar to the sick call requests, the grievances were investigated within days, and Plaintiff was provided with a determination in a timely manner.  And when he refused to sign the forms, he was advised of the repercussions of the grievance process.

It appears that Plaintiff's main point of contention in Defendant Armor's treatment of Plaintiff is that it failed to provide him with the proper anti-depressant medication: Seroquel.  Plaintiff had appealed a decision in March 2013 pertaining to his mental health medical treatment.  (DE 89-10).  But Defendant Armor vetted whether Seroquel was needed for Plaintiff and made the medical decision not to give it to him.

This decision was made upon review of Plaintiff's medical history and current disposition during doctor's visits.  (*Id.*)  He denied being on any active medications during intake visits with nurses and the mental health office, reported a vague history of bipolar disorder, and it was further found that he had no "treatable mental disorder."  (*Id.*)  Nonetheless, Plaintiff's disagreement with a practitioner's decision not to provide him with his requested medication does not amount to a constitutional violation or malpractice pursuant to section 1983.  *See Jones*, 518 F. Supp. 3d at 657.

Additionally, although Plaintiff argues that he has not received psychiatric medication for months, it was *Plaintiff* who discontinued the medication because he wanted to be placed on a "drug-free trial."  (DE 98-35 at 93.)  Thus, the alleged failure to provide medication was based on his own orders and volition.

Accordingly, even taking Plaintiff's account of the facts as true, no rational jury could conclude that either Defendant Armor or Defendant County acted with deliberate indifference.  And that is because no genuine issue of material fact has been raised.

In the event that the Judge Azrack disagrees with this conclusion and concludes that Plaintiff has raised a genuine dispute of material fact regarding his section 1983 claims of deliberate indifference as to all Defendants, the undersigned next analyzes

whether Plaintiff has properly sued (a) private corporate Defendant Armor, (b) the County, (c) the municipality, and (d) individuals under section 1983.

### ii.    Section 1983 Claim Against Defendant Armor

Defendant Armor asserts that Plaintiff cannot establish a viable section 1983 claim against them because private corporations are only liable if they promulgate an official policy which deprives individuals of their constitutional rights.  (DE 89-11 at 20.)  Since Plaintiff asserts a section 1983 claim against Armor, which is a private corporation, Plaintiff must show that Armor's actions were pursuant to an official policy and the constitutional deprivations asserted stemmed from that policy.

Plaintiffs alleging violations of their constitutional rights under section 1983 "must show that the defendant acted under color of state law."  *Jeanty v. Sciortino*, No. 22-cv-319 (BKS) (TWD), 2023 U.S. Dist. LEXIS 64664, at *22-23 (N.D.N.Y. Apr. 13, 2023); (citing *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012)).  "State action occurs where the challenged action of a private party is 'fairly attributable' to the state." *DuBois v. Bedford-Flatbush Chiropractic, P.C.,* 409 F. Supp. 3d 62, 69 (E.D.N.Y. 2019) (citing *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1027 (2d Cir. 1995)); *see also Sylla v. N.Y. City Dep't of Educ*, No. 18-CV-6524 (RPK) (MMH), 2023 U.S. Dist. LEXIS 53352, at *34-35 (E.D.N.Y. Mar. 28, 2023) (finding private corporation liable under section 1983 "because of its entwinement" with public entity).

Plaintiff has the burden to prove that an official policy caused that tort.  *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 410 (2d Cir. 1990); *see also Fisk v. Letterman,* 401 F. Supp. 2d 362, 375 (S.D.N.Y. 2005) (finding that a private corporation can be liable under section 1983 for "its own unconstitutional policies"); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d

Cir. 1983) (noting that plaintiff must demonstrate some sort of causal link between the policy and injury for liability to attach).

There are no facts here demonstrating a policy of depriving inmates of the adequate medical care that Plaintiff alleges.  Further, Plaintiff's faulty memory cannot save him from the deficiencies in his own argument as he has no evidence to support his allegations.  (*Id.*); (*see also* DE 98-7) (noting that Plaintiff says he does not remember what medications he was given as a substitute for Seroquel); *id.* at 102-03 (noting that Plaintiff could not remember if he submitted or appealed grievances against Armor after the October 2013 incident).  The record indicates that Defendant Armor, namely, its staff including Dr. Manetti, have provided Plaintiff with adequate medical care, both for his broken jaw and for his mental health.  If the Seroquel incident is the only one that Plaintiff can point to as support for his lack of adequate mental health, then this would be wholly insufficient to support a policy or custom pursuant to a section 1983 claim.

Plaintiff also references statements in reports and other papers that are not present in this case.  For example, he references cases in which doctors deliberately ignored patient's requests without medical support (DE 89-27 at 10) and points to customs from reports noting use of paper documents as opposed to electronic forms.  (*Id.* at 13.)  However, there is no evidence here sufficient for a genuine issue of material fact of blatant disregard for Plaintiff's sick call requests or grievances, nor is there an allegation of deficient, missing, erroneous, or otherwise disorganized documentation.[5]  Therefore, the results of the reports Plaintiff cites are irrelevant.

---

[5] The undersigned does note however that some portions of the deposition transcripts (none of which were brought to light in Plaintiff's moving papers) consist of statements in which those being deposed could not read the information in Defendants' documents.  *See e.g.* Sanchez Deposition Transcript, DE 98-36 at 44 ("I cannot read it. It's bad."); *Id.* at 47 (Q: "Can you tell what the complaint is?" A: I cannot read it."); Martin-Naar Deposition Transcript, DE 98-26 at 169 ("I can't read it."); *Id.* at 112 (A: "Signature? It's illegible." Q: "Yeah, but the –" A: "I can make out R.N., but I can't tell you who signed it."); Hunt Deposition Transcript, DE 98-27 at 122 (A: "No, it doesn't. I can't read it…").  There are also a few instances in which there were supposed to be checkmarks on various forms but the person investigating

Further, regarding his broken jaw, Plaintiff states that Defendant Armor failed to answer his sick call requests;[6] did not send him to the emergency room after learning of the incident; and relegated him to a liquid diet.  (DE 89-27 at 11.)  As support, he cites cases in which inmates were left *worse* off than before, which are inapposite here because Plaintiff has not, and cannot, establish that Defendants' purported deliberate indifference caused a far worse injury.  (*See* DE 98-18) (letter from doctor noting "no overt acute abscesses" in his left jaw).

Thus, the reports and caselaw Plaintiff relies on for support to lodge a claim against Defendant Armor fail to show a genuine issue of material fact that there was a constitutional policy or custom in place causing the torts he alleges.

### iii.    Section 1983 Claims Against the County of Nassau and Municipality

The County Defendants allege that Plaintiff's excessive force claim cannot survive based on municipal liability because Plaintiff failed to demonstrate that a County policy deprived him of his constitutional rights.  (DE 98-19 at 14.)  They also assert that the Nassau County Sherriff's Department and the Nassau County Correctional Facility have no "legal identity separate and apart from the municipality" and thus cannot be sued.  (DE 98-19 at 18.)  Plaintiff, however, argues that the County should stipulate that they are responsible for the Sheriff's department and the NCC.  (DE 98-37 at 24.)  He further argues that NCC promulgates a policy of excessive force

---

Plaintiff's grievance failed to note this.  *See e.g. Manetti Deposition Transcript*, DE 98-35 at 89 (Q: "Can you explain what is meant to happen there, is there supposed to be a checkmark?" A: I would think so." Q: "There are no checkmarks, correct?" A: "No."); DE 98-26 at 136-37 (noting that the sick call does not indicate whether there has been any kind of triage decision as there was no box checked while others say "seen and addressed"); *Id.* at 204 (Q: "So these are missing the signatures that are required?" A: "Yeah."). The undersigned finds, however, that this does not constitute inadequate medical treatment as to Plaintiff.

[6] Plaintiff consistently states that he submitted "multiple sick requests" "for almost two weeks" however only 9 were recovered in the record (DE 98-25) and he has not contested that any documentation was missing.  (*See* DE 89-27 at 11.)

and deliberate indifference and states the Armor and the County are liable via the doctrine of *respondeat superior*. (*Id*. at 16-17.)

Similar to the claims against a private corporation, a plaintiff must also demonstrate evidence of an unscrupulous policy facilitated by the County to prevail on his section 1983 claim: "[A] municipality, such as the County, can only be liable under section 1983 if an action taken pursuant to official municipal policy caused the alleged deprivation of plaintiff's rights." *Molina v. New York*, No. 21-CV-3144 (RPK) (JMW), 2023 U.S. Dist. LEXIS 8961, at *19 (E.D.N.Y. Jan. 17, 2023). And, "[a]bsent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see also Hall v. New York City Dep't of Corr*., No. 22-CV-5738 (AMD) (MMH), 2022 WL 17811474, at *2 (E.D.N.Y. Dec. 19, 2022) (quoting *Halperin v. New York City Dep't of Correction*, No. 19-CV-6266, 2019 WL 6328775, at *2 (E.D.N.Y. Nov. 26, 2019) (dismissing section 1983 claim against DOC and declining to substitute the City of New York as a defendant where the plaintiff did not allege any unconstitutional policy or custom attributable to the City of New York)).

A plaintiff may establish a policy or custom in one of four ways: "by alleging the existence of (1) a formal policy; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policymakers; or (4) a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those whom municipal employees will come into contact." *Aquino v. City of New York*, No. 16-cv-1577 (GHW), 2017 WL 384354, at *3 (S.D.N.Y. Jan. 25, 2017) (internal quotation marks and citations omitted).

Against this backdrop, and the record submitted, Plaintiff's claims against the County cannot stand. "[U]nder New York law, departments . . . that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Fanelli v. Town of Harrison*, 46 F. Supp. 2d 254, 257 (S.D.N.Y. 1999); *see also Melendez v. Nassau Cnty.*, No. 10-CV-2516 (SJF)(WDW), 2010 WL 3748743 (E.D.N.Y. Sept. 17, 2010) (dismissing claims against Nassau County Sheriff's Department Division of Correction and the Nassau County Correctional Center because both "are administrative arms of Nassau County, and therefore are not suable entities"). The County is therefore not a proper party to this action.

Plaintiff's attempts to use the doctrine of *respondeat superior* to sue both Armor and NCC are to no avail. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). His mere regurgitation of caselaw and the same reports without drawing comparisons to the present facts are inadequate to establish a genuine issue of material fact that County Defendants possessed a custom that caused a violation of his constitutional rights. *See Santos v. N.Y.C.*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (noting that to establish liability under section 1983 "a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists"); *Tropeano v. City of N.Y.*, No. 06-CV-2218 (SLT), 2006 WL 3337514, at *4 (E.D.N.Y. Oct. 31, 2006) ("Though a plaintiff need not show the existence of an explicitly stated rule or regulation, plaintiff cannot prevail where as here [he] has not identified a policy or custom that caused the denial of a constitutional right.").

Further, in his opposition against NCC, he attempts to establish a pattern under *Monell* by pointing to other inmates' statements that their meals were skipped. (DE 98-37 at 16.) However, he fails to identify the names of these inmates, the names of these officers, or the dates

that this meal skipping pattern occurred.  *See McAllister v. New York City Police Dep't*, 49 F. Supp. 2d 688, 705 (S.D.N.Y. 1999) (finding that plaintiff cannot make conclusory allegations of a municipality's pattern or policy of wrongful behavior to make out a *Monell* claim).

Accordingly, the undersigned respectfully concludes that Plaintiff has not established a genuine issue of material fact—he has not demonstrated a systemic practice of negligence, disorganization, or otherwise abusive conduct amounting to deliberate indifference.  Rather, the conduct of Defendants has been shown to be reasonable, considering the response time to Plaintiff's numerous requests.

For these reasons, the undersigned respectfully recommends that Plaintiff's claims against the County under section 1983 fail.

### iv.  Section 1983 Claims Against Individuals Working for the County

County Defendants next argue that even if Plaintiff's claims against the municipality were to survive, his claims against an individual would not because they lack credibility and are now time-barred.  Plaintiff claims that the Complaint establishes personal involvement to assert a viable claim under section 1983 as to the individual defendants.  (DE 98-37 at 4-5.)

In order for a plaintiff to succeed against an individual pursuant to section 1983, he must show that he was injured by a state actor or a private party "acting under color of state law."  *Ortiz v. Parkchester N. Condo.*, No. 16-CV-9646 (VSB), 2018 U.S. Dist. LEXIS 100069, at *9 (S.D.N.Y. June 13, 2018).  "An individual acts under color of state law when [he] exercises power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Id.*  And, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under [section] 1983." *Allen v. Antal*, 665 Fed. Appx. 9, 14 (2d Cir. 2016) (internal citations omitted).

Personal involvement can be demonstrated through any of the following: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

Plaintiff's Complaint alleges that Jay Ward, an officer that Plaintiff purports to work for Defendant NCC, attacked and beat him leaving him with a broken nose and jaw. (DE 1 at ¶ 38.)  He further states that Defendant Ward abused him before he was taken to visit his father.  (*Id*. at ¶ 49.)

Plaintiff cannot demonstrate any of the "personal involvement" situations are present here to establish a claim under section 1983.  Plaintiff is unable to point to an individual directly responsible for the alleged injuries—he cannot remember the date of the incident (DE 98-7 at 10).  In addition, Plaintiff states that Jay Ward was involved in the 2013 and 2014 incidents, but Human Resources records indicate that no officer by that name worked at NCC during that time period.  (DE 98-14.)  And Plaintiff's October 2013 grievance form indicates that he was punched by another inmate—it contains no

mention of an assault by a correctional officer, much less one named Jay Ward.  (*See* DE 89-23 at 89-90) (noting that he does not know anyone by the name of Jay Ward).

Second, even if Plaintiff were to eliminate the "John Doe" defendants by naming the other individuals purportedly responsible for the attacks, the statute of limitations has already passed.  The statute of limitations for section 1983 cases is three years and begins accruing "when the plaintiff knows or has reason to know of the injury which is the basis of his action."  *See Jones v. City of New York,* 571 F. Supp.3d 118, 128 (S.D.N.Y. 2021); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015) (noting that section 1983 has a three-year statute of limitations in New York).  Here, the injury took place on October 29, 2013, and the other incident took place in January 2014.  Plaintiff's claims are thus time-barred and he cannot now add a "John Doe" defendant to this case.

Further, Plaintiff cannot avail himself of Fed. R. Civ. P. 15(c)'s relation back doctrine because he was not "mistaken," nor did he make a spelling error as to who his assailant was.  Indeed, he was quite sure that the culprit was Jay Ward and even described his height, build and complexion.  (DE 98-19 at 7); *see Miehle-Kellogg v. Doe,* No. 19-CV-4943(GRB) (JMW*),* 2023 U.S. Dist. LEXIS 50575, at *16 (E.D.N.Y. Mar. 24, 2023) (noting that plaintiffs' lack of knowledge of the officers' name at the time of filing is not excusable as opposed to a mistaken identity of a party under FRCP 15); *cf. Ceara v. Deacon*, 916 F.3d 208, 213-14 (2d Cir. 2019) (holding that the district court erred in finding that plaintiff's amended complaint did not relate back, because plaintiff included an incorrect but still discernible variation of defendant's surname in the original complaint, namely he referred to defendant Deacon as John Doe, C.O. Deagon, and

Deagan); *Hogan v. Fisher*, 738 F.3d 509, 519 (2d Cir. 2013) (noting that substituting John Doe defendants are only permissible where plaintiffs have (1) diligently searched for the defendant's identity and (2) pled with sufficient specificity to apprise the defendant that they are the intended party).

For these reasons, Plaintiff fails to raise a genuine dispute of material fact as to whether a correctional officer was personally involved in the alleged incident, and whether his claims are time-barred.  Thus, Defendants' motion for summary judgment as to Plaintiff's claims against individual defendants should be granted.

The undersigned next looks to Plaintiff's constitutional claims under the First and Fourteenth Amendments and federal claim under the ADA.

### C. First Amendment Retaliation Claim Against County Defendants

Plaintiff claims that he was retaliated against for filing grievances against Defendants for the 2013 and 2014 incidents.  (DE 98-37.)  The County Defendants state that Plaintiff has set forth no specific allegations pertaining to his constitutionally protected conduct.  (DE 98-19 at 11, 15.)

In order for a prisoner to prevail on a First Amendment retaliation claim brought under 42 U.S.C. § 1983, he or she must show (1) "that the speech or conduct at issue was protected," (2) "that the defendant took adverse action against the plaintiff," and (3) "that there was a causal connection between the protected speech and the adverse action."  *Holland v. Goord*, 758 F.3d 215 (2d Cir. 2014).  Specifically, courts look to whether defendant's "retaliatory conduct would deter a similarly situated individual of ordinary firmness" from exercising his or her constitutional rights.  *Vincent v. Sitnewski*; *see also George v. Cty. of Westchester*, No. 20-CV-1723 (KMK), 2021 U.S. Dist. LEXIS 183336, at *12 (S.D.N.Y. Sept. 24, 2021) (noting that for

adverse actions, courts should look to the circumstances of the case because prisoners "may be required to tolerate more than average citizens"). However, courts have "approach[ed] prisoner claims of retaliation with skepticism and particular care." *Id.*

Here, Plaintiff engaged in a protected activity: filing prison grievances, satisfying the first element for his claim. *See Speaks v. Saeed*, No. 14-CV-06826 (JMA) (AYS), 2022 U.S. Dist. LEXIS 31858, at *23 (E.D.N.Y. Feb. 23, 2022). However, Plaintiff fails to establish the other two elements. Plaintiff claims that he filed grievances alleging that Defendants provided him with delayed, inadequate medical care, and that they withheld his meals. (DE 98-37 at 9.) Specifically, Plaintiff states that with regard to his jaw, he returned to his dorm after surgery despite his complaints that he felt weak, did not receive adequate nutrition from the liquid diet, and was in extreme pain. (DE 98-37 at 10.) He states these pleas were ignored and went unaddressed consisting of a "concerted effort" by both Defendants to punish him. (*Id.*)

However, the record shows that Plaintiff received medical attention on the date of the incident and an x-ray shortly thereafter. (DE 98-39 at 7.) He was even provided surgery post-incident in November 2013. (*Id.*) And, Plaintiff only now raises claims of skipping meals but failed to raise this in his grievance form. He cannot now make this claim after the revelation of such a possibility of a retaliation claim. His allegations fail to establish any adverse action on Defendant's part.

Further, the vague, conclusory allegations in his deposition transcript do not hold water. *See* DE 98-7 at 55 ("It seemed like they would pick on me.") And, when asked who would want to retaliate against you (DE 98-7), he could not provide a concrete answer. (*See* DE 98-20 at ¶ 31.) Thus, Plaintiff fails to point to a scheme of retaliation involving NCC as the basis for his section 1983 claim. *See Nunez v. Goord*, 172 F.Supp.2d 417, 432 (S.D.N.Y 2001) (granting

defendant's motion for summary judgment on Plaintiff's retaliation claim because he failed to provide any direct or circumstantial evidence to support the claim); *Speaks v. Saeed*, 2022 U.S. Dist. LEXIS 31858, at *24, 29 (granting summary judgment for defendant because plaintiff's assertions were stated in a conclusory fashion, which fails to satisfy the causal connection requirement for a successful retaliation claim).

It is for all of these reasons that the undersigned respectfully recommends summary judgment be granted to Defendants as to Plaintiff's First Amendment retaliation claim.

**D.   Discrimination Under the Equal Protection Clause Against County Defendants**

Plaintiff alleges that he was discriminated against based on his bipolar disorder diagnosis. (DE 98-37.)  The County Defendants state that Plaintiff has set forth no specific allegations pertaining to a showing of discriminatory animus.  (DE 98-19 at 11, 15.)

The Equal Protection Clause of the Fourteenth Amendment requires that the government treat all similarly situated people the same.  *Cox v. N.Y. State Dep't of Corr.*, 2023 U.S. Dist. LEXIS 79442 (N.D.N.Y. 2023).  Generally, for a plaintiff to prevail on an Equal Protection Clause claim under the Fourteenth Amendment, plaintiff must demonstrate that: (1) there was "a law that expressly classifies on the basis of [a protected category]"; (2) "a facially neutral law or policy that has been applied in an unlawfully discriminatory manner;" or (3) "a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus."  *Alsaifullah v. Furco*, No. 12-cv-2907 (ER), 2013 U.S. Dist. LEXIS 110398, at *25 (S.D.N.Y. Aug. 2, 2013). However, if plaintiffs are prisoners, they must establish an equal protection violation by showing that "the disparity in treatment cannot survive the appropriate level of scrutiny which . . . means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests."  *Id*. at *25-26.

But the standard differs for Plaintiffs who allege "class of one" theories, in other words, where they have been singled out as a class of one and not based on "class-based discrimination." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (U.S. 2008). "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). Plaintiff must demonstrate that he was "*intentionally* treated differently" from others similarly situated and that "there *is no rational basis* for the difference in treatment." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 58 (2d Cir. 2010) (emphasis supplied).

Plaintiff maintains that he has been diagnosed with bipolar disorder, a disability, since he was a teenager, thus, before he arrived at NCC and he received mental health treatment pre-NCC. Further, he states that NCC knew of his suicide attempts and was aware of his mental health history. (DE 98-37 at 11.) He states County Defendants' notice of his condition coupled with their failure to provide him with proper medical treatment and medication amounts to a constitutional violation.

But Plaintiff has failed to cite to any case law demonstrating whether his disability is part of a "protected class" or whether he would be considered a "class of one." (*See generally* DE 98-37.) Regardless, Plaintiff's argument based on the Equal Protection Claim fails for several reasons.

Plaintiff relentlessly states that bipolar disorder qualifies as a disability and was thus discriminated against pursuant to the Equal Protection Clause. But Plaintiff's dedication to pages and pages as to whether this diagnosis qualifies as a disability is futile because this is not in dispute by Defendants.

Plaintiff has also failed to demonstrate evidence that he was not given medication *because of* his disorder.  (DE 98-39 at 8; DE 98-35 at 120 (discussing *Plaintiff's* request to stop taking medication and go on a "drug-free trial") (emphasis added).  In other words, there is no evidence that he was targeted because of his disability.

And *finally*, in his Complaint, he only states in a conclusory fashion that Defendants "failed to provide…equal protection of [Plaintiff's] rights, when compared to those rights of other similarly situated detainees without me[n]tal disabilities."  (DE 1 at ¶ 63.)   However, he has failed to point to other detainees without his diagnosis that have received treatment rendering them better off than he was.  *See Ruggiero v. Fisher*, 807 Fed.Appx. 70, 74 (2d. Cir. 2020) (finding that the lower court was correct to grant summary judgment because plaintiff failed to prove how he was intentionally treated differently than other similarly situated inmates at different institutions when the facility used restraints); *Green v. Maldonodo*, No. 17-CV-00957 (CSH), 2017 U.S. Dist. LEXIS 131052, at *14-15 (D. Conn. Aug. 17, 2017) (dismissing *pro se* plaintiff's Equal Protections claim because he failed to identify how, based on his disability, he was treated differently than any similarly situated individual).

For these reasons, Plaintiff's Equal Protection claim fails to establish a genuine issue of material fact.

**E. Discrimination Pursuant to Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act Against County Defendants**

Plaintiff contends that Defendants have discriminated against him by virtue of his diagnosis as an individual with bipolar disorder.  (DE 98-37.)  Defendants argue that the lack of discriminatory animus also defeats Plaintiff's ADA and Section 504 claims.  (DE 98-19 at 15.)

For a plaintiff to prevail on a claim under the ADA or the Rehabilitation Act for discrimination, "a plaintiff must demonstrate that (1) she is a qualified individual with a

disability, (2) the defendant is subject to the ADA or the Rehabilitation Act, and (3) she was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of her disability." *GLD v. City of New York*, No. 19-cv-4314 (AT), 2020 U.S. Dist. LEXIS 158432, at *5-6 (S.D.N.Y. Aug. 27, 2020) (citing *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)). "Courts routinely dismiss ADA suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Elbert v NY State Dept. of Corr. Servs*., 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010).

Plaintiff claims that he was disabled,[7] Defendant NCC knew of this disability, and that he even received prior treatment for his disability.  He said that NCC had protocols in place for those who were at risk for suicide and bipolar disorder.  (DE 98-37 at 20-21.)

However, Plaintiff has failed to put forth evidence concerning the third element.[8]  The record is void of any suggestion that Plaintiff was discriminated *because of* his bipolar disability. *See Atkins v. Cnty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003) (explaining that where there is no disparate treatment, there is no claim for discrimination under the ADA); *Schlosser v. Elzea*, No. 19-cv-1380 (SRU), 2020 U.S. Dist. LEXIS 30910, at *10-12 (D. Conn Feb. 24, 2020) (discussing that plaintiff has failed to allege any facts suggesting that he was discriminated against for his disability regarding his mental health); *Elbert,* 751 F. Supp. 2d at 595 (S.D.N.Y. 2010) (collecting cases where plaintiff's ADA claims were dismissed for failure to point to disparate treatment and dismissing ADA claim by disabled inmate that alleged inadequate treatment, but failed to assert that he was treated differently because of his disability).

---

[7] Plaintiff again engages in an extensive analysis as to whether bipolar disorder constitutes a disability under the ADA. (DE 98-37 at 21-23), something not contested by the County Defendants.

[8] The second element is not in dispute.

Plaintiff has not demonstrated that he was excluded from services because of his disorder or otherwise has suffered any injury because of this alleged discrimination.   (DE 98-39 at 5.) Instead, he received medication for months until Plaintiff himself requested a drug free trial (*id.* at 6) and cannot demonstrate discriminatory animus as per the ADA.  (*Id.*)

Further, Plaintiffs' conclusory allegations that he was beaten and placed in solitary confinement and denied medical care which ultimately deprived him of benefits that he was entitled to because of his disability are equally unavailing.  (*See generally* Compl., DE 1.) Instead, the only evidence he can point to is a safety hazard in the mental health unit—he was told he could not wear shoelaces in that unit—which is irrelevant to demonstrate discrimination based on his disability as an individual with bipolar disorder.  (DE 98-7 at 72.)

For these reasons, Plaintiff has failed to establish a genuine issue of material fact for his ADA and Rehabilitation Act claims.

## F.  Supplemental Jurisdiction

In the absence of Plaintiff's federal claims should the Court nonetheless exercise jurisdiction over Plaintiff's remaining state law claims?  Federal courts "may decline to exercise supplemental jurisdiction over [pendent state law claims] if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "Indeed, the Supreme Court has directed that, except in unusual circumstances, 'if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claim should be dismissed as well.'"  *Rosa v. Triborough Bridge & Tunnel Auth.*, No. 18-cv-1384 (BMC), 2019 WL 3718023, at *4 (E.D.N.Y. Aug. 7, 2019) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1996)); *see also Schiffman v. Epstein*, No. 04-cv-2661 (SCR) (LMS), 2009 WL 1787760, at *7 (S.D.N.Y. June 23, 2009) ("The strong preference in this Circuit is for district

courts to decline to exercise supplemental jurisdiction under [section] 1367(c)(3) when all of the federal claims are dismissed from the suit prior to trial."). Courts should balance the "values of judicial economy, convenience, fairness, and comity" in considering whether to exercise supplemental jurisdiction. *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)).

These factors, on balance, weigh against exercising supplemental jurisdiction where no federal claims remain before trial. *See Kolari v. N.Y.-Presbyterian Hosp*., 455 F.3d 118, 123 (2d Cir. 2006) (quoting *Cohill*, 484 U.S. at 350 n.7). Here, if Plaintiff's ADA, Rehabilitation Act, constitutional, and section 1983 claims are all dismissed, there would be no other federal causes of action remaining before this Court. Thus, concerns of judicial economy, convenience, fairness and comity do not weigh in favor of retaining supplemental jurisdiction over the remaining state law claims. *See Espinosa v. Nassau Cnty. Corr. Ctr.*, 20-CV-00223 (GRB) (VMS), 2021 WL 826168, at *4 (E.D.N.Y. Mar. 3, 2021); *see also Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d, 198, 221 (E.D.N.Y. 2015) (*adopting Report and Recommendation*) ("Having dismissed all federal causes of action . . . judicial economy, convenience, fairness and comity weigh against retaining supplemental jurisdiction over the remaining state law claims."); *Moscatelli v. Owl's Nest, Inc.*, No. 19-CV-4255(GRB) (AYS), 2021 WL 3577908, at *6 (E.D.N.Y. Aug. 12, 2021) (holding that judicial economy, convenience, fairness and comity weighed against retaining supplemental jurisdiction over remaining state law claims since federal causes of action were dismissed).

Accordingly, if the undersigned's recommendation for dismissal of Plaintiff's federal causes of action is adopted, it is respectfully recommended that Plaintiff's state law claims be

dismissed without prejudice so that Plaintiff may pursue such claims in state court if he so chooses.

## CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that Defendants' motion for summary judgment (DE 89; DE 98) be granted.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report.  28 U.S.C. § 636(b)(1) (2006 & Supp. 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (summary order) (same).

Dated:  Central Islip, New York.
           August 1, 2023

**RESPECTFULLY RECOMMENDED**,

/S/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge